Filed 9/29/16  P. v. Statler CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHARLES VASIL STATLER,<br><br>        Defendant and Appellant. | A142141<br><br>(Lake County<br>Super. Ct. No. CR931371) |

Defendant Charles Vasil Statler appeals from the trial court's judgment after jury trial sentencing him to 27 years and eight months in state prison for kidnapping, carjacking, making criminal threats and numerous sentencing enhancements.  The sole issue raised by defendant on appeal is that the trial court should have stayed his punishments for kidnapping and making criminal threats pursuant to Penal Code section 654 because all of his actions in question were part of one indivisible course of conduct and objective:  to force his victim to tell him what she knew about purportedly stolen marijuana worth about $150,000.  We conclude there is substantial evidence that defendant's actions were divisible and taken for multiple objectives.  Therefore, we affirm the judgment.

1

## BACKGROUND

In March 2014, the Sonoma County District Attorney filed an amended information charging defendant with kidnapping (Pen. Code, § 207, subd. (a); count 1),[1] carjacking (§ 215, subd. (a); count 2), false imprisonment (§ 236; count 3), robbery (§ 211; count 4), grand theft (§ 487, subd. (c); count 5), unlawfully driving and taking a vehicle (Veh. Code, § 10851, subd. (a); count 6), and making criminal threats (§ 422; count 7). The district attorney also alleged as to some or all of the counts that defendant had a prior serious or violent felony conviction, had prior serious and violent felony convictions, and had served a prior prison term, making him eligible for certain sentence enhancements. A jury trial began later that same month.

## I.

### *Sheri Reese's Testimony*

The prosecution's main witness was Sheri Reese. She testified that over about eight hours in the afternoon and evening of December 4, 2012, defendant and two other men forcibly took her and her car to several different locations while one or the other of them threatened to rape and otherwise harm her and/or her elderly housemate, sought and eventually took about two pounds of marijuana from her home and demanded she tell them who stole approximately $150,000 of marijuana.

According to Reese, in 2012 she worked trimming marijuana on a property in Upper Lake, California with defendant's nephew, Robert Whitmire. Defendant worked there as well. At one point, defendant told Reese he had been convicted of voluntary manslaughter for killing a man he had hit too hard, which scared Reese.

Reese testified that sometime before December 4, 2012, with defendant present, Whitmire dropped off approximately two pounds of marijuana at Reese's home for Reese to trim. Reese kept this marijuana in a safe in her garage. At about 2:15 in the afternoon of December 4, 2012, Reese was driving her Ford Escape on a street in Upper Lake when a white SUV driven by defendant cut in front of her car and blocked it. Defendant and

---

[1] All statutory references herein are to the Penal Code unless otherwise stated.

two other men, whose names Reese later learned were Ricky McCullough and Danny Austin, jumped out of the SUV and screamed at her, telling her not to go anywhere or she would be killed. Defendant told her not to try and run. He screamed at her, " 'You know why.' " Reese did not know what he was talking about.

Defendant pulled the keys out of Reese's car's ignition and forcibly took them from her. He told her she was coming with him, that he would kill her if she tried to run and that she "was in the worse possible trouble that [she] could ever imagine." Defendant jumped in her car and the men "physically" made her get into the back seat of the SUV, McCullough holding her arm as they did so. Defendant took her purse, which had a nonworking phone in it, and would not let her have any of her things thereafter. She did not see the phone again.

McCullough, Reese and Austin then drove in the SUV a block and a half to Reese's house and defendant drove Reese's car there. Defendant wanted the marijuana Whitmire had dropped off there and told Reese she was going to give it to him. Defendant stayed in the car as Austin and Reese went into her garage. However, Reese said she did not have the combination to the safe, and the group left after a few minutes. Defendant told her that if she did not do what he said or give him the information he wanted it was possible the elderly woman Reese lived with "would get the shit beat out of her."

Next, defendant drove the SUV, with Reese and Austin in it, to the property where Reese and defendant had worked together. McCullough drove Reese's car there. Austin told Reese to tell them what they needed to know if she did not want to be hurt, and that if she just cooperated it would be all over. Defendant screamed at her that she had better tell him what he needed to know or he would kill her, rape her or bring her to a club and have everybody there do whatever they wanted to her, including sodomize her. Defendant told her "[h]e wanted the name of someone who was responsible for stealing from his sister's boy" what he said was about $150,000 of marijuana. Reese told him she did not know. Defendant called her a liar and said he was going to do whatever it took to

3

get the information out of her.  He told her he thought she was responsible for stealing the marijuana because she was the only one allowed on the property.

When the group got to the property, they left Reese's car by a creek and continued onto the property in the SUV, with defendant driving.  They drove on the back side of the property for 20 minutes to half an hour, until they arrived at an area with tents where Reese had previously seen marijuana being dried.  Defendant screamed at her the whole time.  Austin continued to try to coax her to talk, but told her that he ultimately would do what defendant wanted.

Defendant exited the car while Austin continued to talk to Reese.  Defendant came back to the vehicle and said, " 'You know, you're going to tell me what I need to know, otherwise we'll have our way with you.  We'll do whatever the fuck we want to you.  Hell, we can leave you here with one of these boys and they'll do whatever they want.  They can have fun screwing you all over the property.' "  Defendant said Austin had come from out of town to "carry out anything he wanted him to do" to Reese and had "no problems cutting people's fingers off or breaking their hand or doing whatever it takes to get the information out."  At some point, defendant wanted to know where Reese's children lived.  When she told him she did not know anything about the stolen marijuana, defendant demanded the name of somebody who did, and said that "[a]s long as it was a credible name [she] would be released and nothing would happen to [her] or anybody else."  She refused to just give him any name, as she had no idea who had stolen the marijuana.  Defendant threatened to put her in her car and set it on fire.  At another point, defendant said to someone on the phone, " 'She has no idea how much trouble she's in, you know, she fucked with the wrong family.' "

At another point, defendant told Austin to cut off Reese's fingers.  Austin got a tool–a pliers or wire cutter–and put it on Reese's fingers.  Austin told her to give him any name, but she refused and pushed her fingers further into the tool and told him to cut her fingers off because she was not going to tell him anything.  Austin told Reese he would not really harm her, but said he could not speak for defendant or McCullough.  She was only slightly injured by the tool, which was her own fault, not Austin's.  Around the time

4

Austin put the tool on her fingers, the men found she had a "Go Phone" in her pocket. Defendant grabbed it and was angry with her for having it; she did not see this phone again either.

Defendant drove the others off the property in his SUV, with McCullough getting out by the creek to drive Reese's car off the property as well. The group went to a fast food restaurant for food. Defendant continued to scream at her. He directed McCullough to park Reese's car at a gas station near the restaurant. The men then ordered food at the restaurant's drive-through. Defendant told Reese "not to say a fucking word," and she did not. Defendant also offered to get her food, but she declined the offer, too scared to eat.

After the men ate their food in the SUV, they drove off again, getting on Highway 29 towards Kelseyville. At one point, they pulled over and McCullough and defendant got out and made a phone call. They called over Austin and spoke to him, then offered to allow Reese out of the car to smoke. She refused, feeling safer in the SUV.

After about fifteen minutes, the men got back in the SUV and the group drove away. Reese did not know where they were going. Defendant never stopped yelling at her. He told her by the time they got to their destination, she had better have the information he needed or "things were going to get a lot worse." He referred to rape and questioned whether anyone would miss her when she was gone. McCullough agreed with defendant and said "a little word or two here and there." Austin told her to calm down, said he was sorry this was happening to her and told her to tell them what defendant wanted to know.

The group stopped at the Hilltop Residential Center. Defendant told Reese to stay in the SUV and say nothing. McCullough retrieved something from the back, and he and defendant left for five minutes, with Austin staying in the car with Reese. When defendant returned, he said, " 'Have you decided whether you're going to tell me what I need to know?' "

Next, defendant drove back the way they had come. Defendant drove as if he was tired, accepted Austin's offer to drive, and fell asleep in the front passenger's seat.

5

Austin again told Reese he would not harm her. They returned to the gas station where Reese's car was parked and defendant, now awake, told Austin to get in it. He ordered Reese to get in the front seat of the SUV, which she did reluctantly.

The group drove to Reese's house. Defendant told Reese she was going to give him the marijuana that Whitmire had dropped off for her to trim, and that she "better not be pulling no shit because he'll take that old woman out and beat the crap out of her." Reese went to the safe, opened it this time, and gave the marijuana to Austin. She could not recall how she had the combination at that time. She was unhappy because she had told Whitmire she would give him the marijuana when he paid her $850 that he owed her.

Austin wrote down his phone number and told Reese he was sorry he had met her under these circumstances. Defendant gave her back a key and her purse, but refused to give her back her key fob or her phones. She also discovered later that six hundred dollars was missing from a pocket of her jacket, which had been in her car all day. The men left at about a quarter to eleven or so; they had taken her for about eight hours.

Reese did not have contact with defendant again, although she thought he might have subsequently driven by her house. She went to the police soon after the men left her house and was told to contact the sheriff's department. A few days later she reported the incident to the sheriff's department, doing so anonymously and over the Internet because she was concerned about her safety.

## II.

### *Closing Argument, the Verdict and Sentencing*

In closing argument, defense counsel contended there were meaningful discrepancies between Reese's testimony and other evidence presented at trial, which included testimony by Austin, a statement by Austin to police, and testimony about a statement by defendant to police. Based on these discrepancies, defense counsel contended that Reese was not credible and that the evidence indicated she had consensually spent an enjoyable December 4, 2011, with the three men drinking and doing drugs. He argued there was reasonable doubt that defendant committed any crime.

The jury obviously rejected defendant's counsel's argument. It acquitted defendant of robbery (count 4), but convicted him of kidnapping, carjacking, unlawful taking and driving of a vehicle, and making criminal threats (counts 1, 2, 6 and 7).[2] The court found the accompanying sentencing enhancement allegations to be true.

Defendant argued that his sentence for the conviction of unlawful taking and driving of a vehicle should not be imposed pursuant to section 654 and that all the convictions were for crimes committed for the single purpose of trying to get Reese to admit she stole Whitmire's marijuana.

The trial court sentenced defendant to a total state prison term of 27 years and eight months. The court sentenced defendant to separate, consecutive terms for kidnapping, carjacking and making criminal threats, setting the carjacking sentence as the principal term. In doing so, the court stated that it would impose a concurrent sentence for the unlawful taking and driving a vehicle conviction, and stayed its imposition pursuant to section 654. It continued, "The others, however, their crimes and objectives, there is some independent objectives here. And the 422 [making criminal threats], I think should also run consecutively. They were multiple threats, death threats, threats of gang rape, all of which were far in excess of what was necessary to initiate a kidnapping or carjacking. And the crimes were committed at different times and/or separate places. They were over a period of several hours, all over different places in the county. I intend to run the three of them—the kidnap, the carjacking, and the criminal threats— consecutively." The court also ordered defendant to pay various fines and fees and awarded him time served and conduct credits.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues the trial court should have stayed the punishments for the kidnapping and making criminal threat convictions pursuant to section 654 because he

---

[2] The court instructed the jury that false imprisonment (count three) was a lesser included offense of kidnapping and grand theft (count 5) was a lesser included offense of robbery. The jury returned acquittal verdicts on these counts.

engaged in "a single uninterrupted course of conduct against a sole victim for a single and very specific purpose—to get Reese to confess to stealing marijuana from [defendant's] nephew, or to reveal the name of a person who did."[3] We disagree.

Section 654 provides in relevant part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a); see *People v. Correa* (2012) 54 Cal.4th 331, 337 [" 'In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct' "].) Thus, by its plain terms, section 654 bars multiple punishments of a single, physical act or omission.

Our Supreme Court expanded the scope of section 654 in *Neal v. State of California* (1960) 55 Cal.2d 11 when it stated: "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Id.* at p. 19.) The court explained in a later case, "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in

---

[3] In his opening brief, defendant argued that, along with the punishment for the making criminal threats conviction, the punishment for the carjacking conviction should have been stayed. The People pointed out in their respondent's brief that because the court designated the sentence for carjacking conviction as the principal term, defendant would have to argue the punishment for the kidnapping conviction should have been stayed instead. Defendant acknowledged this was the case in his reply brief.

8

pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).)

Subsequently, in *People v. Latimer* (1993) 5 Cal.4th 1203, our Supreme Court characterized this single intent and objective test as a " 'judicial gloss' that could defeat section 654's purpose of matching punishment with culpability. (*Id.* at p. 1211.) Nonetheless, the court did not overrule the test, but instead wrote that nothing in *Latimer* was "intended to cast doubt on any of the later judicial limitations of the *Neal* rule." (*Id.* at p. 1216.) The court explained, "Decisions since *Neal* have limited the rule's application in various ways. Some have narrowly interpreted the length of time the defendant had a specific objective, and thereby found similar but *consecutive* objectives permitting multiple punishment. (E.g., [*Harrison*,] *supra*, 48 Cal.3d at pp. 334–338 [multiple sex crimes each have the separate objective of achieving additional sexual gratification]; *People v. Perez* (1979) 23 Cal.3d [545,] 551–554 [similar]; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368 ['each shot [fired at the same victim] evinced a separate intent to do violence'].) [¶] Other cases have found separate, although sometimes simultaneous, objectives under the facts. (E.g., *People v. Coleman* (1989) 48 Cal.3d 112 [assault of robbery victim had separate intent and objective than the robbery]; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 189–193, 196 [harming of unresisting robbery victim a separate objective from the robbery itself]; *People v. Booth* (1988) 201 Cal.App.3d 1499, 1502 ['dual objectives of rape and theft when entering the victims' residences' supported separate punishment for burglaries and rapes]; *People v. Porter* (1987) 194 Cal.App.3d 34, 37–39 [robbery and kidnapping the same victim for a later, additional, robbery had separate objectives].) . . . . [¶] These examples, which are not exhaustive, have helped mitigate the concerns regarding the *Neal* test in specific situations . . . ." (*Latimer*, *supra*, 5 Cal.4th at pp. 1211–1212.)

Thus, "there is no legal or logical bar to separate punishment" where a defendant engages in separate, volitional, criminal acts, for a "defendant should . . . not be rewarded where, instead of taking advantage of an opportunity to walk away from the

victim, he voluntarily resumed his [criminal] behavior." (*Harrison*, *supra*, 48 Cal.3d at p. 338.)  Further, where offenses are "volitional and calculated," and "separated by periods of time during which reflection was possible," separate punishment is permissible under section 654.  (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368 (*Trotter*).)  Indeed, the Supreme Court has recently determined that "section 654 does not bar multiple punishment for multiple violations of the same criminal statute," disapproving what it characterized as "dictum" in *Neal*.  (*People v. Correa*, *supra*, 54 Cal.4th at p. 334.)  Further, [i]f . . . a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct."  (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525.)

As for our review of a trial court's ruling on a section 654 issue, "[t]he defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence."  (*People v. Perry*, *supra*, 154 Cal.App.4th at p. 1525.)  We " ' "view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence." ' "  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312–1313.)  Where the trial court does not make an express finding, an implied finding that the crimes were divisible must be upheld if supported by the evidence.  (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638.)  However, "the applicability of [section 654] to conceded facts is a question of law."  (*Harrison*, *supra*, 48 Cal.3d at p. 335.)

Defendant argues that section 654 applies to his kidnapping and making criminal threats convictions because "the evidence shows without contradiction that the carjacking, kidnapping, and criminal threats were crimes committed during a single indivisible period of time for a very specific reason—to get Reese to reveal the stolen marijuana, or to give up the name of a person who stole it . . . ."  But this argument ignores that Reese's testimony contains substantial evidence that defendant had multiple objectives and time to reflect in committing his crimes.  He, Austin and McCullough

10

initially carjacked and kidnapped Reese on the afternoon of December 4, 2012, on a street near Reese's home. However, according to Reese, upon doing so, defendant, threatening to kill her and forcing her into his SUV, first took her to her home and demanded she give him the approximately two pounds of marijuana that Whitmire had previously dropped off there, and threatened to harm her elderly housemate. When she did not do so, he forced her back into his SUV and drove her, and had her car driven, away to the property where they had worked together. From this point, he demanded from Reese, via numerous threats to rape, sodomize, mutilate and kill her, information about another matter—the purported theft of approximately $150,000 of marijuana—as he took her to the property, a fast food restaurant/gas station, Highway 29, the Hilltop Residential Center, and back to the gas station—with defendant engaged in phone calls and napping at different points along the way. When defendant did not obtain any information from Reese, he forcibly brought her and her car back to her home late that night and demanded anew the approximately two pounds of marijuana she kept in a safe there, threatening to harm the elderly woman who lived with her.

These facts are similar to those in other cases in which courts rejected arguments that punishment should be stayed pursuant to section 654 because it found multiple objectives and divisible conduct in the defendant's acts. For example, in *Harrison*, which the *Latimer* court favorably cited, the defendant attacked the victim and inserted his finger into her vagina. The victim struggled, causing the defendant's finger to become dislodged; he reinserted it, it became dislodged again, and he reinserted it a third time. These events occurred over a period of no more than 10 minutes. (*Harrison*, *supra*, 48 Cal.3d at pp. 325–326.) The defendant was convicted of, and sentenced for, three counts of forcible penetration. On appeal, he contended he could not be separately punished for these convictions pursuant to section 654. Our Supreme Court disagreed, holding that each penetration amounted to a new and separate crime. (*Harrison*, *supra*, 48 Cal.3d at pp. 328–330.)

In *Trotter*, which the *Latimer* court also favorably cited, the defendant was convicted of three counts of assault for firing three gunshots at a police officer within a

11

couple of minutes. (*Trotter*, *supra*, 7 Cal.App.4th at p. 366.) In rejecting the defendant's argument that all three shots "manifested the same intent and criminal objective," the appellate court stated, "[T]his was not a case where only one volitional act gave rise to multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable." (*Id.* at pp. 367–368.) The separate punishment imposed for two assaults was affirmed. (*Id.* at p. 368.)

In *People v. Surdi* (1995) 35 Cal.App.4th 685, the defendant, along with others associated with the "Family Mob," including a man named Lomeli, attacked and beat a man named Sanchez, left, then returned to attack him more, moved Sanchez to a van, where Lomeli stabbed him, and took him to a school and eventually to a riverbed where he was beaten, stabbed, and then abandoned. Sanchez survived, but was permanently disabled. (*Id*. at pp. 687–688.) The defendant was convicted, among other things, of conspiracy to commit murder, aggravated mayhem, and kidnapping and the court imposed separate prison terms for each offense. The *Surdi* court rejected the defendant's argument that execution of sentence on the kidnapping conviction should have been stayed pursuant to section 654. The court reasoned: "Like *Trotter,* the offenses presently under review did not arise from a single volitional act. Rather, they were separated by considerable periods of time during which reflection was possible. Lomeli's initial stabbing attack was interrupted in the van to permit Surdi to strap down Sanchez with a seat belt. There was also a break in the action when the group stopped at a school and discussed whether to abandon Sanchez there. After ample time to consider their actions, the group resumed the attack while taking Sanchez to the riverbed, where Mob members took turns stabbing Sanchez until they thought he was dead." (*Surdi*, at p. 689.) Following *Trotter,* the *Surdi* court concluded the offenses did not arise from a single volitional act. (*Ibid*.)

Similarly, here, there is substantial evidence that defendant had multiple, separate objectives over the eight hours he held Reese, threatened her and controlled her car,

separated in time and by the numerous opportunities for defendant to reflect and choose whether or not to commit further criminal acts. After forcing Reese to her home to get the marijuana she kept in a safe there, defendant abandoned this objective. Instead, he took Reese to several different locations, had her car driven to two of them, and repeatedly threatened to harm or kill her in order to force information from her about the purportedly stolen marijuana. During this period, he had numerous opportunities to reflect, including when Reese returned to his car and reported that she was unable to retrieve the marijuana in the safe at her home; when Reese provided no information despite Austin's use of the tool on her fingers and defendant spoke on the phone; when defendant paused from his activities to eat in the SUV at the fast food restaurant; when defendant stopped the SUV on Highway 29 and got out for about 15 minutes and talked with someone on the phone; when defendant left Reese in the car at the Hilltop Residential Center for about five minutes; and after defendant napped in the SUV on the way back to the gas station. Hours later, having failed to obtain any information from her other than that she did not know what he was talking about, defendant turned to yet another objective, which was his effort anew to get the two pounds of marijuana Reese kept in a safe at her home. He drove her, and had her car driven to, her home as he threatened to harm her and her elderly housemate, and this time succeeded in getting the marijuana.

Defendant relies heavily on *People v. Britt* (2004) 32 Cal.4th 944 for his contention that the court erred. Britt, a sex offender registrant, was convicted of failing to notify officers of his change of address and failing to register after moving to a new county, and was sentenced to consecutive prison terms for each offense. (*Id.* at p. 949.) He appealed, claiming the imposition of separate punishments violated section 654. (*Id.* at pp. 949–950.) Our Supreme Court agreed with him because Britt had acted with the single objective of avoiding police detection in committing these two offenses. (*Id.* at p. 952.) Here, however, as we have discussed, defendant had multiple objectives. Therefore, the case is inapposite.

Defendant cites other cases to support his proposition that each of his crimes

13

was committed in an indivisible course of conduct and for a single purpose. However, only two address the application of section 654 and they both involve plainly indivisible conduct. (See *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1213, 1218–1221 [staying a sentencing enhancement for use of a deadly or dangerous weapon during the commission of the burglary because this use was part of the same indivisible conduct that resulted in assault convictions]; *People v. Guzman* (1996) 45 Cal.App.4th 1023, 1025–1028 [concluding trial court erred in imposing sentences for burglary, grand theft and robbery when the trial court found that section 654 applied because all three were based on one indivisible course of conduct][4].) Therefore, they too are inapposite.

Defendant also attempts to explain away this evidence of separate intents and objectives by pointing out that the prosecutor in his closing argument emphasized that defendant's motive and objective was to obtain information from Reese about the purportedly stolen marijuana. First, defendant notes that the prosecutor argued, "What was the motive? We heard it from Sheri Reese and Danny Austin over and over and over again. It went on for over five hours. 'Where's the marijuana you stole from us?' 'Tell us where the marijuana is.' 'Where's the marijuana you stole from us?' . . . [T]hat's the motive in the case." Defendant cites the prosecutor's summary of defendant's statement to police, which also emphasized defendant's focus on the stolen marijuana. Finally, defendant emphasizes that the prosecutor argued to the jury, "One of the big red herrings in this case is the attempt to confuse [defendant's] efforts to get the 140 pounds of marijuana with the two pounds. . . . [¶] But that's not what [defendant] was after. . . . [¶] . . . [Defendant]'s claiming that she and her boyfriend stole 140 pounds of marijuana. That's why he pulled her over. That's what he was threatening her about. It had nothing to do with this two pounds marijuana."

Defendant's citations are accurate, but his argument misses the point.

_____

[4] The *Guzman* court actually stayed the robbery punishment, but reversed the grand theft conviction because it was a lesser included offense to robbery. (*People v. Guzman*, *supra*, 45 Cal.App.4th at p. 1028.)

14

Whatever the prosecutor argued to the jury, the court's sentencing determination was supported by substantial evidence. Defendant does not establish the prosecutor's arguments should be a basis for reversal in light of this substantial evidence.

In short, defendant's actions were divisible, separated by time and the numerous opportunities he had to reflect, and based on multiple and separate intents and objectives. Therefore, the court did not err in sentencing him to separate punishments for his kidnapping, carjacking and making criminal threats convictions.

In light of our conclusion, we also reject defendant's additional argument that the trial court's sentencing him to separate punishments was arbitrary and unsupported by any evidence and, therefore, violated his federal constitutional due process rights.

## DISPOSITION

The judgment is affirmed.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
MILLER, J.

*People v. Statler* (A142141)